## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 30 2020, 10:32 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jennifer L. Schrontz
Schrontz Legal Group, LLC
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Frances Barrow
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

In the Termination of the Parent-Child Relationship of:
J.S. and J.N.B. (Minor Children),

and

J.B.S. (Mother)

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

November 30, 2020

Court of Appeals Case No.
20A-JT-1022

Appeal from the Tippecanoe Superior Court

The Hon. Kurtis G. Fouts, Special Judge

Trial Court Cause Nos.
79D03-1907-JT-111
79D03-1907-JT-112

**Bradford, Chief Judge.**

# Case Summary

[1]     J.B.S. ("Mother") is mother to thirteen-year-old J.N.B. and five-year-old J.S. (collectively, "the Children").[1]  In August of 2017, the Indiana Department of Child Services ("DCS") removed the Children from Mother's care and petitioned to have them adjudicated children in need of services ("CHINS").  In January of 2018, following a violent incident in Mother's home involving her boyfriend D.L. and another man, DCS filed second CHINS petitions related to the Children.  In May of 2018, the juvenile court found the Children to be CHINS.  In June of 2018, the Children were placed in foster care, and Mother was ordered to participate in and complete several services.  In June and July of 2019, the juvenile court conducted hearings at which it heard evidence that Mother was still with D.L. and, although aware that there were issues that needed to be addressed, had difficulty accepting that.  Mother indicated that she believed that all of the problems in her relationship with D.L. were her fault.

[2]     On July 31, 2019, DCS petitioned to terminate Mother's parental rights to the Children ("the TPR petitions").  On August 23, 2019, Mother pled guilty to Level 3 felony dealing in methamphetamine, her ten-year sentence for which was largely to be served through community corrections and on supervised probation.  Four hearings on the TPR petitions were held between October of

---

[1] While the parental rights of J.N.B.'s and J.S.'s fathers were also terminated in this proceeding, neither participates in this appeal.

2019 and January of 2020. The juvenile court heard evidence that Mother, despite being made aware that reunification with the Children was unlikely as long as she remained with D.L., was still involved with him as of December of 2019. The juvenile court also heard evidence regarding Mother's inconsistent employment history, that Mother's therapy had not progressed very far, and that visitation with the Children had not gone well and had been suspended. In April of 2020, the juvenile court terminated Mother's parental rights to the Children. Mother contends that she was denied fundamental due process throughout the termination proceedings and the juvenile court erred in terminating her parental rights to the Children. Because we disagree, we affirm.

## Facts and Procedural History

[3] J.N.B. was born on June 20, 2007, to Mother and A.W. On October 12, 2012, Mother entered into a program of informal adjustment ("IA") regarding J.N.B. and two of her other children following an investigation into inappropriate discipline. Following a review hearing on July 16, 2013, the juvenile court dismissed the IA at DCS's request based on Mother's successful completion of services. On February 11, 2015, J.S. was born to Mother and W.S.

[4] On August 9, 2017, DCS sought to take the Children into emergency custody, a request the juvenile court approved that day. On August 14, 2017, DCS petitioned to have the Children adjudicated CHINS. The juvenile court found following an initial hearing on August 15, 2017, that Mother was homeless, J.S. had been left without a caregiver at a friend's home, and that Mother had refused to pick J.S. up. At that time, the Children were placed in relative care

but were eventually returned to Mother, who had secured housing. The juvenile court ordered that when the Children were returned to Mother's care, they were not to have any contact with Mother's boyfriend, D.L.

[5] On January 18, 2018, DCS filed second CHINS petitions as to the Children and sought to take them into emergency custody. DCS alleged that a violent incident between D.L. and another man had occurred in the Children's presence (during which a firearm was pulled) and that Mother was struggling to maintain stable housing and income and had untreated mental illness. J.N.B. also alleged that D.L. had whipped her legs with a belt several times and that she had been touched on the inner thigh by an acquaintance of D.L the previous summer.

[6] On May 21, 2018, the juvenile court found the Children to be CHINS, noting that Mother had allowed D.L. to continue living in her home despite the no-contact order. As detailed in the juvenile court's order, Mother had admitted to a service provider that she had allowed D.L. to live with her but claimed that she was afraid to ask D.L. to leave and that he had destroyed some of her property. Mother, however, also indicated that she considered D.L. to be her only support, did not understand why he could not be around the Children, and did not believe him to be a threat to them. Mother also noted that J.N.B. had been exposing herself to other children, "acting out sexually[,]" posting photographs of herself on the internet, stealing, and lying. Ex. Vol. II p. 151.

[7] On June 12, 2018, the juvenile court ordered that the Children be placed in foster care and participate in therapy, follow all recommendations, and take

medications as prescribed, among other things. The juvenile court also ordered Mother to have therapeutic visits with each of the Children separately for at least two hours per week and participate in home-based case management, random drug screens, a mental-health assessment, a parenting assessment, a substance-abuse assessment, a medication evaluation, and individual therapy, following all recommendations resulting therefrom.

[8] On August 21, 2018, the juvenile court ordered the Children to be placed with maternal aunt and uncle and to have no contact with their parents without DCS approval. On September 21, 2018, the juvenile court ordered J.N.B. placed in foster care while J.S. remained with a maternal aunt and uncle. On December 12, 2018, the juvenile court ordered that the Children's placements be continued, with J.N.B.'s permanency plan being reunification and J.S.'s plan being reunification with a concurrent plan of third-party custody or guardianship.

[9] At a hearing on June 29, 2019, Mother testified that DCS was willing to offer D.L. services but that she and D.L. had had an altercation approximately two weeks previously. Mother testified that when she had broached the subject of services with D.L., he said that she was lying, believed that he was being "profiled[,]" and punched a hole in a wall. Ex. Vol. II p. 10. Mother indicated that she felt that D.L. punching a hole in the wall was better than punching her.

[10] At a hearing on July 8, 2019, Mother's therapist Laura Houze testified that she had provided therapy to Mother since the beginning of May of 2018, with the main goal being to work with Mother on skills to cope with the stress of the

CHINS case and past trauma. Houze testified that although Mother had learned and utilized some coping skills, there had been ongoing stressors in her life and Mother had had difficulty regulating her emotions, dealing with the stressors, controlling her impulses, and settling her emotions.

[11] Regarding domestic violence and Mother's relationship with D.L., Houze testified that Mother was aware of the dynamics but had difficulty accepting them. "While I'm aware that things aren't as severe with [D.L.] as they have been in other relationships she's engaged in, um, there's still dynamics that are concerning. That need to, to be addressed, between both of them and individually." Ex. Vol. II p. 24. Houze testified that Mother believed she caused all of the problems with D.L. "because she was getting on [D.L.] about doing whatever things that he was supposed to do that day[.]" Ex. Vol. II p. 28. Mother "wasn't concerned about her safety, um, felt like she had instigated the [] circumstances, and that was kind of the end of that[.]" Ex. Vol. II p. 29. Houze testified that she had not moved to the next stage of therapy with Mother—the trauma narrative—because of "ongoing emotional stability concerns" and because "more things kept coming up, and coming up, that would direct [Mother] into this trauma mode of just reacting and reacting, so it was constantly putting out fires." Ex. Vol. II p. 30. On July 8, 2019, the juvenile court changed the permanency plan to termination of parental rights and adoption for the Children.

[12] On July 31, 2019, DCS filed petitions to terminate Mother's parental rights to the Children. A total of four evidentiary hearings on the TPR petitions were

held on October 16, December 4, and December 11, 2019, and January 17, 2020. On August 23, 2019, Mother pled guilty to Level 3 felony dealing in methamphetamine and was sentenced to ten years of incarceration, with five years and 253 days to be served through Tippecanoe County Community Corrections and four years and 112 days to be served on supervised probation. On December 4, 2019, DCS family case manager Kelly Moore ("FCM Moore") testified that she had been involved with Mother's case from May or 2018 to April of 2019. FCM Moore indicated that the Children had initially been removed from Mother's care in the fall of 2017 for homelessness and removed again in January of 2018 due to the altercation involving D.L. and another man that had occurred in the Children's presence, during which a weapon had been drawn.

[13] FCM Moore testified that Mother had been required to participate in parenting visits and individual therapy in the CHINS case, with the two most important things to focus on being her relationship with D.L. and her mental-health needs. FCM Moore indicated that, during her time on the case, Mother reported that she was employed but never produced any paystubs. During FCM Moore's time on Mother's case, Mother was never able to progress past supervised visitation due to concerns about D.L.'s continued presence in her life and Mother's lack of progress in addressing her mental-health issues and understanding the Children's traumas.

[14] Houze, who was still seeing Mother as of December 4, 2019, testified that Mother was still living with D.L., with their last encounter occurring a few days

before the hearing, during which they had engaged in a verbal argument. Houze also indicated that, issues involving D.L. aside, Mother was "struggling considerably right now for multiple reasons[,]" including "physical limitations[,] financial distress, [and] lack of positive supports." Tr. Vol. II pp. 53–54. Houze testified that she had not been able to progress to the trauma narrative with Mother because she was not sufficiently emotionally regulated.

[15] Court-appointed special advocate Hilary Laughner ("CASA Laughner") testified that she had been involved with Mother's case since October of 2018, with anywhere from one to five interactions per month with Mother since then. CASA Laughner testified that it was "absolutely" in J.S.'s best interests to be adopted so that he could have a home free of domestic violence and that would allow him to be stable. Tr. Vol. II p. 114. CASA Laughner indicated that J.S. had been in at least four or five different foster-care placements since his removal from Mother's care and that he had exhibited behaviors such as kicking, hitting, and smearing his feces on the wall.

[16] As for J.N.B., CASA Laughner testified that she had been in approximately three foster homes since her removal from Mother's care and was currently placed at Damar Residential so that she could receive the help she needs. CASA Laughner agreed that J.N.B. had been diagnosed with post-traumatic stress disorder, reactive-attachment disorder, and borderline-personality traits. Casa Laughner indicated that adoption was in J.N.B.'s best interests as well because she deserved a home free of domestic violence and where her bare minimum needs could be met. CASA Laughner indicated that adoptive

families for J.B. and J.N.B. had been identified. CASA Laughner expressed concern that Mother did not have the ability to parent J.N.B. the way that she needed to be parented.

[17]     On December 11, 2019, clinical psychologist Dr. Jeffrey Vanderwater-Piercy testified regarding an evaluation he had performed on Mother on November 18, 2018. Dr. Vanderwater-Piercy opined that Mother suffered from low cognitive function, generalized-anxiety disorder, post-traumatic-stress disorder, depressive disorder, and attention-deficit-hyperactivity disorder and recommended continued medication and consultation with a psychiatrist. Visit facilitator Lana Hamel worked with Mother and the Children during the summer of 2019, and testified that many of the scheduled visits had been cancelled. Hamel testified that, of the visits that had occurred, some went well, and some did not. On one occasion, Mother threated to "whoop [J.S.]'s a[**]" because he had thrown a box containing some jewelry. Tr. Vol. II p. 163. On another occasion, the then-four-year-old J.S. had an "accident[,]" and Mother was unprepared with diapers for him. In the end, visitation was terminated shortly into August of 2019 because Mother cancelled or failed to appear for several visits and did not provide a schedule. CASA Laughlin testified again, noting that Mother seemed to struggle with visitation when more than one child was involved and that J.S. would cry, scream, and become very emotional when Mother would cancel or fail to attend visitation.

[18]     DCS family case manager Kaci Lawrence ("FCM Lawrence") was assigned to Mother's case in April of 2019, apparently taking over from FCM Moore.

FCM Lawrence testified that following the CHINS determination, Mother had been required to participate in therapy, home-based case management, parenting time, a substance-abuse assessment, a mental-health assessment, a psychological assessment, and random drug screens. FCM Lawrence testified that although Mother had been generally compliant with those services, there had been housing concerns based on Mother's statements that she would no longer be able to pay her rent. One possible solution suggested by Mother was that she and J.S. would move in with the father of another one of her children, but FCM Lawrence became concerned because Mother had told her that he had abused her. FCM Lawrence also noted that Mother had lied to them about D.L. no longer being "in the picture[.]" Tr. Vol. II p. 204. According to FCM Lawrence, the DCS permanency plan for J.N.B. was adoption by her godmother in Michigan, and the permanency plan for J.S. was adoption in his pre-adoptive foster care placement. As for Mother's employment history, FCM Lawrence indicated that Mother had had approximately six jobs in the previous seven months and had provided her with no documentation for any of them, despite being asked to several times. The TPR hearing concluded on January 17, 2020. On April 13, 2020, the juvenile court entered its order terminating Mother's parental rights to J.N.B. and J.S.

# Discussion and Decision

## I. Whether Mother Was Denied Due Process

[19] The question of whether Mother's due process rights were violated is one of "fundamental fairness." *In re C.G.,* 954 N.E.2d 910, 917 (Ind. 2011). Indeed,

while due process has never been defined, the phrase embodies a requirement of "fundamental fairness." *Id.* (citations omitted). The fundamental fairness "requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Id*. (citing *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)).

[20] *Mathews* set forth that the process due in a termination of parental rights proceeding turns on the balancing of three factors: (1) the private interests affected by the proceeding; (2) the risk of error created by the State's chosen procedure; and (3) the countervailing governmental interest supporting use of the challenged procedure. *Mathews*, 424 U.S. at 335. The balancing of these factors recognizes that although due process is not dependent on the underlying facts of the particular case, it is nevertheless "flexible and calls for such procedural protections as the particular situation demands." *In re C.G.,* 954 N.E.2d at 917 (citing *Mathew*s, 424 U.S. at 334). Furthermore, because both the parent and the State have substantial interests affected by the termination proceeding, reviewing courts tend to focus on the third *Mathew*s' factor, *i.e.*, the risk of error created by the juvenile court's and DCS's actions. *Id.* at 917–18.

[21] Moreover, there must be a showing of actual harm to support Mother's due process argument. *Jenkins v. State*, 492 N.E.2d 666, 669 (Ind. 1986). Indeed, Ind. App. Rule 66(A) provides that

> [n]o error or defect in any ruling or order or in anything done or omitted by the trial court or by any of the parties is ground for granting relief or reversal on appeal where its probable impact, in light of all the evidence in the case, is sufficiently minor.

*See also Lander v. State*, 762 N.E.2d 1208, 1213 (Ind. 2002); *Rosales v. State*, 3 N.E.3d 1014, 1019 (Ind. Ct. App. 2014). Mother identifies the following as establishing a denial of due process: (1) the juvenile court found on January 18, 2018, that DCS had failed to follow a court order when it "stopped drop ins in Mother's home over a month, without Court approval[,] Ex. Vol. V p. 169; (2) the juvenile court stated on July 12, 2019, that "DCS has failed to provide what this family needs, specifically what [J.N.B.] needs. And we have to get this back on track.", Ex. Vol. V p. 174; (3) there were a total of six FCMs assigned to the Children's case; (4) DCS changed the Children's placements several times; (5) DCS never put any services into place for D.L.; and (6) DCS failed to offer her adequate services to address the domestic-violence issue.

[22] The items identified by Mother do not rise to the level of blatant violations of basic and elementary principles of due process. As for the juvenile court's finding that DCS had violated a court order in suspending visitation for a month in late 2017 or early 2018, Mother does not explain, and we fail to see how, that violation could have constituted a denial of due process in a TPR case that was not initiated until July 31, 2019. Mother also does not elaborate on exactly what DCS was failing to do for J.N.B. in July of 2019 (again, before the TPR petition was even filed) that amounts to a denial of due process.

[23] Mother also focuses on the number of FCMs assigned to the various cases involving her and the Children over the years, which is six, and the number of placements for the Children since August of 2017, which is eleven for J.N.B. and thirteen for J.S. Mother seems to be arguing that the sheer number of

FCMs and placements, in and of itself, constitutes a due process violation. Mother, however, does not claim, much less establish, that any of this was improper, or indeed even unusual in a series of cases (two CHINS cases and a TPR) dating back to August of 2017. As for Mother's complaint that none of the FCMs provided services to D.L., she fails to acknowledge evidence that DCS *was* willing to provide services to D.L. but that he refused them. In fact, when FCM Lawrence asked Mother to talk to D.L. about services, he accused Mother of lying about them, claimed that he was being profiled, and punched a hole in the wall.

[24] Finally, Mother suggests that DCS failed to provide her with proper services to address her domestic violence issues. DCS tried to refer Mother to a psychiatrist after Dr. Vanderwater-Piercy conducted an evaluation of Mother on November 16, 2018, and recommended that Mother find a psychiatrist to manage medication and to continue with individual therapy. DCS, however, ultimately was not able to refer Mother to a psychiatrist because of her dealing-in-methamphetamine charge. Moreover, after Mother's conviction and when she was on house arrest, DCS arranged for Mother to see a doctor in Logansport, Indiana, but Mother said she preferred to work with Houze on her medication management. In any event, to the extent that Mother wanted different services, the onus was on her to inform the juvenile court, and there seems to be no indication that she did so. *See Prince v. Dep't of Child Servs.*, 861 N.E.2d 1223, 1231 (Ind. Ct. App. 2007) ("[T]he responsibility to make positive changes will stay where it must, on the parent. If the parent feels the services

ordered by the court are inadequate to facilitate the changes required to reunification, then the onus is on the parent to request additional assistance from the court or DCS."). Mother has failed to establish a due process violation.

## II. Whether Sufficient Evidence Supports the Juvenile Court's Termination of Mother's Parental Rights

[25] The traditional right of a parent to establish a home and raise her children is protected by the Fourteenth Amendment to the United States Constitution. *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). We acknowledge that the parent-child relationship is "one of the most valued relationships of our culture." *Id.* (citation omitted). However, parental rights are not absolute, and the law allows for the termination of such rights when a parent is unable or unwilling to meet his responsibilities as a parent. *In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied*. The purpose of terminating parental rights is to protect the child, not to punish the parent. *Id.*

[26] While remaining mindful of the above, we have long had a highly deferential standard of review in cases concerning the termination of parental rights. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). "In determining whether the evidence is sufficient to support the judgment terminating parental rights, this court neither reweighs the evidence nor judges the credibility of witnesses." *Id.* "We consider only the evidence that supports the judgment and the reasonable inferences to be drawn there from." *Id.* "Findings of fact are clearly erroneous

only when the record lacks any evidence or reasonable inferences to support them." *Id.*

[27] Indiana Code section 31-35-2-4(b)(2) governs what DCS must allege and establish to support the termination of parental rights, which, for purposes of our disposition, was:

> (A) that [t]he child has been removed from the parent for at least six (6) months under a dispositional decree[;]
>> [….]
> (B) that one (1) of the following is true:
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied [or]
>> (ii) There is a reasonable probability that the continuation of the parent–child relationship poses a threat to the well-being of the child.
>> [….]
> (C) that termination is in the best interests of the child; and
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). It is worth noting that because Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, DCS need only establish one of the circumstances described in the subsection. Mother contends that DCS failed to establish that (1) there is a reasonable probability that the conditions that resulted in the Children's removal or the reasons for placement outside Mother's home will not be remedied, (2) continuation of the parent–child relationship poses a threat to the Children's well-being, (3) termination is

in the Children's best interests, and (4) there is a satisfactory plan for the care and treatment of the Children.

## A. Indiana Code Section 31-35-2-4(b)(2)(B)(i)

Mother argues that DCS has failed to establish that there is a reasonable probability that the reasons for the Children's continued removal would not be remedied. In making such a determination, a juvenile court engages in a two-step inquiry. First, the juvenile court must "ascertain what conditions led to their placement and retention in foster care." *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013). After identifying these initial conditions, the juvenile court must determine whether a reasonable probability exists that the conditions justifying the children's continued "placement outside the home will not be remedied." *In re D.D.*, 804 N.E.2d 258, 266 (Ind. Ct. App. 2004) (citation omitted).

The juvenile court is to focus not only on the initial reasons for removal "but also those bases resulting in continued placement outside the home." *In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*. In making this second determination, the juvenile court must judge a parent's fitness to care for her children at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re D.D.*, 804 N.E.2d at 266. A parent's habitual patterns of conduct must also be evaluated to determine the probability of future negative behaviors. *K.T.K.*, 989 N.E.2d at 1234. DCS need not rule out all possibilities of change; rather, it must establish that there is a reasonable

probability that the parent's behavior will not change. *In re B.J.*, 879 N.E.2d 7, 18–19 (Ind. Ct. App. 2008), *trans. denied*.

[30] Here, the Children were removed from Mother following a violent incident in January of 2018 between D.L. and another man, during which a firearm was pulled. J.N.B. also alleged that D.L. had hit her on the legs several times with a belt and that an acquaintance of D.L.'s had touched her inner thigh the previous summer. Mother argues that the conditions that resulted in the Children's removal were essentially remedied. In its termination order, however, the juvenile court made the following unchallenged findings of fact relevant to the reasonable-probability element:

> 1. The Mother [h]as a long and extensive history of being involved in relationships which include significant domestic violence.
> 2. The Mother's violent relationships have had a profound negative impact on [Children].
> 3. The Mother continues to fail to appreciate the impact of her relationship choices on her children.
> 4. The Mother's current violent relationship is with [D.L.], whom she has refused to disassociate herself from during the pendency of this case.

Appellant's App. Vol. II p. 49.

[31] In addition to these unchallenged findings, the record contains ample evidence that Mother continued to have a relationship with D.L. and that she did not believe domestic violence was an issue. Houze testified that [w]hile I'm aware that things aren't as severe with [D.L.] as they have been in other relationships she's engaged in, um, there's still dynamics that are concerning. That need to,

to be addressed, between both of them and individually." Ex. Vol. II p. 24. Houze also testified that Mother believed she caused all of the problems with D.L. "because she was getting on [D.L.] about doing whatever things that he was supposed to do that day." Ex. Vol. II p. 28. Houze said Mother "wasn't concerned about her safety, um, felt like she had instigated the situate [*sic*], circumstances, and that was kind of the end of that." Ex. Vol. II p. 29.

[32] When the juvenile court found the children to be CHINS on May 21, 2018, it found, *inter alia*, that Mother had allowed D.L. to live in the home despite the no-contact order. At the time, Mother told a service provider that she was afraid to ask D.L. to leave and he had destroyed some of her property but that she considered D.L. her only support, did not understand why D.L. could not be around her children, and did not believe D.L. would put her children in danger. Mother told FCM Moore that Mother did not agree with the concerns about D.L. Over a year later in June of 2019, Mother and D.L. had an altercation during which he punched a hole in the wall after Mother brought up the possibility of him receiving services.

[33] Even after the TPR petitions were filed in July of 2019, Mother refused to distance herself from D.L. On December 4, 2019, Houze testified that Mother had had contact with D.L. the Saturday before the hearing, and she believed that Mother and D.L. were still living together. CASA Laughner testified that it was also her understanding was that Mother and D.L. were still together. Mother admitted that the last time she had had contact with D.L. was the night before the December 4, 2019, hearing.

[34] Where a parent's "pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve." *In re A.H.*, 832 N.E.2d 563, 570 (Ind. Ct. App. 2005). Here, the evidence showed that Mother did not make significant progress in addressing domestic violence. *See In re J.S.*, 906 N.E.2d 226, 234 (Ind. Ct. App. 2009) ("[S]imply going through the motions of receiving services alone is not sufficient if the services do not result in the needed change, or only result in temporary change[.]").

[35] As mentioned, the juvenile court was obligated to examine Mother's habitual patterns of conduct, *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014), which in this case included minimizing the harm from domestic violence with D.L., blaming herself for the incidents, and maintaining a relationship with D.L. even though she had been advised to stay away from him. DCS produced ample evidence to support the juvenile court's conclusion that the domestic violence conditions that led to Children's removal would not be remedied.

[36] Mother argues that "[t]he most compelling evidence was testimony provided by Laura Houze, Mother's therapist, which revealed that Mother has consistently and actively participated in therapy, therapy was addressing domestic violence and Mother was making progress." Appellant's Br. p. 26. Even if we assume that Mother's characterization of the evidence is accurate, she is asking us to reweigh the evidence, which we will not do. *In re N.G.*, 51 N.E.3d at 1170. In any event, we do not think it is fair to say that the evidence tends to show that Mother was making progress in therapy with regard to domestic violence or

that the therapy was progressing in general.  Houze testified in July of 2019 that she did not move to the next stage of Mother's therapy because of "ongoing emotional stability concerns," and because "more things kept coming up, and coming up, that would direct [Mother] into this trauma mode of just reacting and reacting, so it was constantly putting out fires."  Ex. Vol. II p. 30.  Houze also testified that Mother's stability gradually increased during the last two-to-three months, but that Mother would have difficulty using coping skills if a traumatic event occurred.  As for addressing Mother's issues with domestic violence, that does not even seem to have been the principal goal of the therapy.  Houze testified that addressing abusive relationships was not a treatment goal, but was addressed in connection with trauma and learning coping skills and that she and Mother addressed Mother's relationship with D.L. "[i]ntermittently."  Tr. Vol. II p. 52.  We reject Mother's argument, which is essentially nothing more than an invitation to reweigh the evidence.[2]

## B.  Indiana Code Section 31-35-2-4(b)(2)(C)

[37]     Mother also argues that the juvenile court erred in concluding that termination of her parental rights was in the Children's best interests.  We are mindful that, in determining what is in the best interests of the Children, the juvenile court is required to look beyond the factors identified by DCS and look to the totality of the evidence.  *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185,

---

[2]  Because of our disposition of this claim, we need not address Mother's claim that the juvenile court erred in concluding that there is reasonable probability that the continuation of the parent–child relationship poses a threat to the well-being of the Children.  *See* Ind. Code § 31-35-2-4(b)(2)(B)(ii).

203 (Ind. Ct. App. 2003). In doing so, the juvenile court must subordinate the interests of the parents to those of the children involved. *Id.*

[38] This court has previously determined that the testimony of a GAL regarding a child's need for permanency supports a finding that termination is in the child's best interests. *In the matter of Y.E.C.*, 534 N.E.2d 273, 276 (Ind. Ct. App. 1992). Although not a GAL, CASA Laughner testified at the termination hearing that it was "absolutely" in J.S.'s best interests to be adopted so that he could have a home free of domestic violence and that would allow him to be stable. Tr. Vol. II p. 114. As for J.N.B., CASA Laughner indicated that adoption was in her best interests as well because she deserved a home free of domestic violence and where her bare minimum needs could be met. While this testimony is likely sufficient to support a finding that termination is in the Children's best interests, is does not stand alone.

[39] The juvenile court found that termination of the parent–child relationship is in the Children's best interests because placement with Mother would place the Children at "substantial risk for physical, mental and emotional abuse" and "Mother fails to recognize the seriousness of domestic violence in her home and the effect it has on her children[.]" Appellant's App. Vol. II p. 56. These findings are amply supported by evidence in the record, namely evidence that Mother will not separate herself from D.L., with whom she has a long history of domestic violence. In the end, termination of Mother's parental rights is in Children's best interests because Mother will not provide them with an environment free of domestic violence and, indeed, does not even seem to

acknowledge that there is a problem. *See e.g.*, *Lang v. Starke Cty. Office of Family & Children*, 861 N.E.2d 366, 373 (Ind. Ct. App. 2007) ("A parent's historical inability to provide a suitable environment along with the parent's current inability to do the same supports a finding that termination of parental rights is in the best interests of the children."), *trans. denied*.

[40] Mother seeks to downplay concerns with domestic violence, arguing that she "was actively attending and making progress in her therapy where she was addressing domestic violence and its effects on her children." Appellant's Br. p. 32. As discussed above, however, Houze's testimony indicated that domestic violence was not even the principal treatment goal; she and Mother discussed it only intermittently; and, in any event, there were "still dynamics that are concerning" as of July 8, 2019. Ex. Vol. II p. 24. In the end, Mother's argument in this regard is an invitation to reweigh the evidence, which we will not do. *In re N.G.*, 51 N.E.3d at 1170.

## C. Indiana Code Section 31-35-2-4(b)(2)(D)

[41] Finally, Mother contends that DCS failed to establish that it has a satisfactory plan for the care and treatment of the Children. Indiana courts have traditionally held that for a plan to be satisfactory for purposes of the termination statute, it "need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated." *Lang*, 861 N.E.2d at 374 (Ind. Ct. App. 2007) (citation omitted). A DCS plan is satisfactory if it is to attempt to find suitable

parents to adopt the children and is not rendered unsatisfactory if DCS has not yet identified a specific family to adopt them. *Id.*

[42] DCS's plan for Children's care and treatment is adoption. Child J.S. was being transitioned to an adoptive family, and, in fact, was already living in the pre-adoptive home. FCM Lawrence was satisfied that DCS's plan for J.S. was satisfactory. As for J.N.B., CASA Laughner testified that her godmother was willing to adopt her. At the time of the evidentiary hearing, J.N.B.'s godmother lived in Michigan and was working towards becoming a licensed foster parent. Pursuant to *Lang* and similar cases, the juvenile court did not abuse its discretion in finding these plans for the care and treatment of the Children to be satisfactory.

[43] Mother contends that J.N.B.'s plan is not satisfactory because it would place her "with a Godmother she barely know[s] who is not equipped to deal with her behaviors[.]" Appellant's Br. p 36. The record, however, undercuts both of these factual assertions. The record contains evidence that J.N.B. and her godmother speak from two to four times a week, and the godmother told FCM Lawrence that J.N.B. had been part of her life for a very long time and "her family has not been complete without [J.N.B.]" Tr. Vol. II p. 214. As for the godmother's ability to cope with J.N.B.'s behaviors, the record indicates that the godmother was aware of J.N.B.'s problems and could handle them and that the Michigan child services agency had provided services to the godmother, including training on trauma-informed care. The Michigan agency also conducted a home visit for the godmother and has approved the placement.

Finally, Mother contends that "placing JS with the maternal [aunt] for adoption versus guardianship or third-party custody [] as a matter of law [] is simply unacceptable[.]" Appellant's Br. p. 36. Mother, however, cites to nothing in the record and no law to support this argument. Again, Mother is essentially asking us to reweigh the evidence, which we will not do. *See In re N.G.*, 51 N.E.3d at 1170.

[44] We affirm the judgment of the juvenile court.

Najam, J., and Mathias, J., concur.